UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ROMAN VAZQUEZ BARRERA, *et al*, § <br> § <br> Petitioners, § <br> VS. § <br> § <br> CHAD WOLF, *et al*, § <br> § <br> Respondents. § | CIVIL ACTION NO. 4:20-CV-1241 |

## **MEMORANDUM AND ORDER**

Pending before the Court is Petitioner-Plaintiffs' Motion for Temporary Restraining Order. (Doc. No. 12). Petitioner-Plaintiffs ("Plaintiffs") seek a temporary restraining order to compel their immediate release from civil immigration detention. Plaintiffs, both of whom have medical conditions that make them particularly vulnerable to serious illness or death if they were to be infected by the novel coronavirus, claim that their continued detention in the face of the current COVID-19 pandemic violates their Fifth Amendment right to due process. After considering the Motion, the parties' briefs and supplemental briefs, Amici Curiae's brief, parties' oral arguments, and all applicable law, the Court determines that Plaintiffs' Motion for Temporary Restraining Order should be **GRANTED** in part, as a preliminary injunction, and **DENIED** in part.

**I.     BACKGROUND**

Plaintiffs are two individuals[1] who are detained by Immigration and Customs Enforcement (ICE) at the Montgomery Processing Center (MPC) in Conroe, Texas. (Doc. No. 1 ¶ 1). Both

---

[1] Plaintiffs' original petition and complaint was filed on behalf of four Plaintiffs. However, only two Plaintiffs remain in custody. Roman Vazquez Barrera was released from ICE custody on April 11, 2020. (Doc. No. 13). Luis Par Alvarado, was granted release on bond by an immigration court on April 10, 2020. (Doc. No. 22, at 7). On April 16, 2020, Mr. Par Alvarado posted bond and was

1

Plaintiffs suffer from chronic health conditions that make them particularly susceptible to serious illness or death if they contract COVID-19. *Id.* ¶¶ 10, 12; CDC, *At Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

- Plaintiff Georgina Rojas is a 28-year-old woman who has a body mass index of 48.3, which exceeds the Center for Disease Control's (CDC) threshold of 40 for elevated risk from COVID-19. *Id.* ¶ 10.
- Plaintiff Bassam Jebril is a 37-year-old man who has several respiratory issues and frequently experiences difficulty breathing and chest pains. He also has high blood pressure and is on a restricted diet. *Id.* ¶ 12.

Ms. Rojas is subject to mandatory detention under 8 U.S.C. § 1226(c), pending final adjudication of her removal proceedings. (Doc. No. 22, at 8). Mr. Jebril has a final order of removal and is thus held in mandatory detention under 8 U.S.C. § 1231(a)(2). *Id.* at 9.

Both Plaintiffs are currently detained at MPC, an immigration detention facility that is operated by a private corporation, GEO Group, Inc. (Doc. No. 12-1, at 10). As of April 13, 2020, Defendants assert that only one GEO Group employee has tested positive for COVID-19, and no detainees have tested positive yet. (Doc. No. 22, at 11); *see also* Elizabeth Trovall, *Immigrant Detention Center Employee Tests Positive for COVID-19*, Hous. Pub. Media (Mar. 24, 2020), https://www.houstonpublicmedia.org/articles/news/health-science/coronavirus/2020/03/24/365114/immigrant-detention-center-employee-tests-positive-for-covid-19/. As of April 13, 2020, three detainees had been tested. (Doc. No. 22-5 ¶ 18). There are around 833 individuals housed at MPC. *See* Trovall. Plaintiffs allege that multiple detainees have exhibited symptoms consistent

---

released from detention. (Doc. No. 40). Plaintiffs accordingly no longer seek relief on Mr. Vazquez Barrera's or Mr. Par Alvarado's behalf. (Doc. No. 13; Doc. No. 40).

with COVID-19, such as coughing, body aches, and other flu-like symptoms, but have not been tested or isolated. (Doc. No. 1 ¶ 52).

At this point, the COVID-19 pandemic is well-known to all Americans. The Court will not recount its rapid development and its impact on our community here, as it has been well-discussed in other sources and court filings. It cannot be contested that the novel coronavirus that causes COVID-19 is highly contagious, and that among those who develop COVID-19, many require extended intensive emergency care, assistance breathing using mechanical ventilators, and round-the-clock professional medical care. The virus is able to spread undetected among populations, given its long incubation period and asymptomatic presentation in some individuals. There is currently no cure or vaccine. The only way to protect our communities is to "socially distance" ourselves—avoid unnecessary human contact and maintain a safe distance of at least six feet from other people—and practice diligent hygiene, by frequently washing our hands and disinfecting commonly touched surfaces.

MPC has put certain procedures in place in response to the growing pandemic. Social visitation has been suspended, and all staff and visitors are screened for symptoms and given temperature checks before entering the facility. (Doc. No. 22-5 ¶ 10). All elective off-site medical and lab appointments have also been suspended. *Id.* ¶ 11. At intake screenings, new detainees are assessed for fever and respiratory illness, and asked if they have come into "close contact with a person with laboratory-confirmed COVID-19 in the past 14 days, and whether they have traveled from or through area(s) [sic] with sustained community transmission in the past two weeks." *Id.* ¶ 13. Individuals with COVID-like symptoms are isolated and, if they test positive, treated in isolation. *Id.* ¶ 14. Asymptomatic individuals exposed to a person with confirmed or suspected COVID-19 are placed in cohorts with others who have been exposed and monitored for symptoms

3

for fourteen days. *Id.* ¶¶ 15–16. Field units have also been instructed to educate detainees on the importance of covering their coughs with their elbows and requesting assistance if they feel ill. *Id.* ¶ 17.

However, Plaintiffs allege that MPC's actions do not protect them from infection, and thus, likely serious illness or death. While the CDC has announced that maintaining at least six feet of distance from others is crucial to preventing transmission, such distance is impossible to maintain in a detention environment. (Doc. No. 12-1, at 11). In MPC in particular, many detainees live in rooms of up to ninety detainees, sleeping in stacked beds that are as little as one or two feet apart. *Id.* Most detainees share bathrooms and other common spaces. *Id.* at 11–12. Plaintiffs also allege that MPC has not provided detainees with hand sanitizer or tissues, and many also lack soap and paper towels, items that the CDC considers essential for transmission prevention and has instructed detention facilities to provide. *Id.* at 12; CDC, *Interim Guidance of Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf. Additionally, MPC allegedly has not provided detainees masks, has not provided detainees who clean the facility with gloves, and has not required its officers to wear masks when interacting with detainees. (Doc. No. 12-1, at 12). MPC has also allegedly failed to provide detainees with any education about the virus, how it spreads, how to prevent spread, what symptoms to track, and what to do if detainees become symptomatic. *Id.* at 13. MPC's actions in the face of this pandemic, allege Plaintiffs, is "wholly insufficient" to protect Plaintiffs. *Id.*

Plaintiffs filed their Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief on April 8, 2020. (Doc. No. 1). They filed their Motion for Temporary Restraining Order on April 10, 2020. (Doc. No. 12). The Court held a telephonic hearing on April

14, 2020 and took the Motion under advisement. (Minute Entry 4/14/2020). The Court now turns to Plaintiffs' Motion.

## II. LEGAL STANDARD

To receive injunctive relief, Plaintiff must show: "(1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the [] injunction will not disserve the public interest." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citing *Canal Auth. v. Callaway*, 489 F.2d 567, 572–73 (5th Cir. 1974)); *see Parker v. Ryan*, 960 F.2d 543, 545 (5th Cir. 1992) ("[T]he requirements of [R]ule 65 apply to all injunctions."). Where Defendants were given notice of the motion as required for a preliminary injunction under Rule 65(a)(1), and the Court holds an adversary hearing, a motion for temporary restraining order may be treated as a preliminary injunction. 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2951 (3d ed. 2002).

## III. ANALYSIS

Plaintiffs Georgina Rojas and Bassam Jabril are mandatorily detained pursuant to 8 U.S.C. §§ 1226(c) and 1231(a)(2), respectively. They challenge the constitutionality of their continued detention during the COVID-19 pandemic. Plaintiffs are seeking relief both through a writ of habeas corpus and through a direct constitutional claim for declaratory and injunctive relief under the Fifth Amendment's Due Process Clause. The Court will address Plaintiffs' claims for temporary relief under habeas. The Court finds relief cognizable under Plaintiffs' habeas petition; therefore, it does not address the direct constitutional claim for relief.

5

**1. Substantial Likelihood of Prevailing on the Merits**

*a. Jurisdiction to Grant Habeas Relief*

As an initial matter, Defendants claim that Plaintiffs will not prevail under a writ of habeas corpus because (1) the Fifth Circuit does not allow conditions-of-confinement claims to be brought as habeas petitions and (2) Plaintiffs Jabril and Rojas are being detained under mandatory detention statutes, which bars the Court from issuing habeas relief.

28 U.S.C. § 2241 provides a district court with jurisdiction over petitions for habeas corpus where a petitioner is "in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2241(c)(3); *see INS v. St. Cyr*, 533 U.S. 289, 305 (2001). Habeas corpus has been recognized as an appropriate vehicle through which noncitizens may challenge the fact of their civil immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 688 (2001); *see generally Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) (ruling on merits of habeas petition challenging validity of indefinite mandatory detention).

Defendants argue that the Court cannot grant habeas relief on a challenge to Plaintiffs' conditions of confinement. Generally, habeas petitions seek release from custody, while civil rights actions are the proper vehicle to attack unconstitutional conditions of confinement. *Carson v. Johnson*, 112 F.3d 818, 820 (5th Cir. 1997) (first citing *Pugh v. Par. of St. Tammany*, 875 F.2d 436, 439 (5th Cir. 1989), then citing *Cook v. Tex. Dep't of Crim. Justice Transitional Planning Dep't*, 37 F.3d 166, 168 (5th Cir. 1994)). However, the line between these two types of claims is "a blurry one." *Poree v. Collins*, 866 F.3d 235, 243 (5th Cir. 2017) (quoting *Cook*, 37 F.3d at 168). While challenges to the "fact or duration of confinement" are usually brought under habeas, *id.* at 242, the Supreme Court has not explicitly foreclosed the use of habeas for conditions-of-confinement claims, *Boumediene v. Bush*, 553 U.S. 723, 792 (2008); *see also Poree*, 866 F.3d at

6

243. The Fifth Circuit has not explicitly limited habeas petitions to only "fact or duration" challenges and has described its own precedent on the matter as "less clear." *Poree*, 866 F.3d at 243–44; *see id.* at 244 n.28 (citing Fifth Circuit cases that conflict on whether habeas and § 1983 claims are mutually exclusive). However, even in its own cases limiting habeas petitions in conditions-of-confinement challenges, the Fifth Circuit states that habeas is appropriate if a ruling in the petitioner's favor would "automatically entitle [the petitioner] to accelerated release." *Carson*, 112 F.3d at 821 (finding that, where petitioner's reassignment from administrative segregation would not automatically entitle him to immediate release on parole, but "merely enhance eligibility for accelerated release," habeas was an inappropriate vehicle to challenge conditions of confinement).

The Court need not decide today whether conditions-of-confinement cases that do not challenge the "fact or duration" of detention properly sound in habeas. Plaintiffs seek immediate release from detention because there are no conditions of confinement that are sufficient to prevent irreparable constitutional injury given the facts presented in their individual cases. Where an individual is "challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release," the proper remedy is a writ of habeas corpus. *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973); *see also Poree*, 866 F.3d at 243 ("Which statutory vehicle to use depends on the nature of the claim and the type of relief requested . . . ."); *Carson*, 112 F.3d at 820–21. Indeed, the Fifth Circuit has granted habeas relief where the petitioner was seeking immediate release from prison, even where the dissent was arguing the case was one involving conditions of confinement. *Coleman v. Dretke*, 409 F.3d 665, 669–70 (5th Cir. 2005) ("[N]either the Supreme Court nor this court has held that certain claims must be brought under § 1983 rather than habeas." *Id.* at 670.)

7

Because Plaintiffs are challenging the fact of their detention as unconstitutional and seek relief in the form of immediate release, their claims fall squarely in the realm of habeas corpus. The mere fact that Plaintiffs' constitutional challenge requires discussion of conditions in immigration detention does not necessarily bar such a challenge in a habeas petition. Plaintiffs do not challenge the specific mitigation measures MPC are choosing to implement; rather, Plaintiffs argue that there are no possible steps that MPC can take that would protect their constitutional rights while they remain detained during the COVID-19 pandemic in its current form. (Doc. No. 1 ¶ 112 ("The circumstances of this case make clear that release is the only means to ensure compliance with the Fifth Amendment's prohibition on punitive detention.")).

Defendants cite a variety of cases in which courts in the Fifth Circuit have denied habeas relief to individuals claiming that their conditions of confinement amount to mistreatment, because the appropriate remedy is correction of conditions, not release. (Doc. No. 22, at 14–15; Doc. No. 25, at 4–5). The Court is aware that, in most cases, unconstitutional conditions of confinement can be remedied through injunctions that require abusive practices be changed. However, the current case is not one where such injunctive relief is available. We are living in unprecedented times. The COVID-19 pandemic threatens our communities and has required us to upend our routines and assumptions. With no known vaccine or cure for COVID-19 and the highly contagious and asymptomatic nature of the novel coronavirus, as well as overwhelmed medical systems throughout our communities, our prisons, jails, and detention facilities are facing outbreaks that differ from any infectious disease outbreaks that have occurred in the past. Given what is currently known about COVID-19 prevention and CDC guidelines, Plaintiffs have asserted, both in briefing and during the motion hearing, that no risk mitigation that the Court could order would appropriately protect Plaintiffs' constitutional rights. Courts around the country have recognized

similar assertions and ordered immediate release of particularly vulnerable detainees from ICE facilities under writs of habeas corpus as a result. *See, e.g.*, *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *2–3 (E.D. Mich. Apr. 5, 2020) (finding that, although Sixth Circuit law stated that habeas was not the appropriate vehicle for challenging conditions of confinement, petitioner was properly seeking immediate release under habeas as the only adequate relief during COVID-19 pandemic); *see also Bent v. Barr*, No. 19-cv-06123, 2020 WL 1812850, at *2 (N.D. Cal. Apr. 9, 2020) (finding that habeas petition challenging continued detention during COVID-19 pandemic challenges validity of confinement, not conditions of confinement); *Coreas v. Bounds*, No. TDC-20-0780, 2020 WL 1663133, at *7 (D. Md. Apr. 3, 2020) ("[A]lthough the grounds on which they seek release relate to their conditions of confinement, Petitioners seek complete release from confinement, which is 'the heart of habeas corpus.'"). Thus, because Plaintiffs challenge the validity of their continued confinement and because Plaintiffs seek immediate release from confinement as their only remedy, Plaintiffs' claims were properly brought under 28 U.S.C. § 2241 and the Court has jurisdiction to rule on Plaintiffs' petition for habeas corpus.

Defendants also argue that the Court is barred from granting habeas relief because Plaintiffs are mandatorily detained under 8 U.S.C. §§ 1226(c) and 1231(a)(2). Defendants present no case law that asserts that mandatory detention statutes strip courts of habeas jurisdiction.[2] Rather, the Supreme Court has consistently allowed for habeas challenges to detention statutorily mandated by the Immigration and Nationality Act. *See, e.g.*, *Jennings*, 138 S. Ct. at 837–38, 838–39

---

[2] Defendants cite a Seventh Circuit case in which the court denied a noncitizen's request for release from immigration detention on bond. (Doc. No. 25, at 2 (citing *Bolante v. Keisler*, 506 F.3d 618, 619 (7th Cir. 2007)). However, the petitioner in *Bolante* was seeking bond while his immigration case remained pending before the Seventh Circuit on a petition for review, not through a petition for habeas corpus. *Bolante*, 506 F.3d at 619. The Seventh Circuit explicitly noted that it had "[i]nherent judicial authority to grant bail to persons who have asked for relief in an application for habeas corpus." *Id.* at 620.

(deciding merits of habeas petition challenging indefinite mandatory detention under §§ 1225(b) and 1226(c)); *Demore v. Kim*, 538 U.S. 510, 517 (2003) (finding jurisdiction to review habeas challenge to § 1226(c)). Indeed, in order for a statutory provision to bar habeas review, the Supreme Court has required "a particularly clear statement" of Congress's intent to do so. *Demore*, 538 U.S. at 517 (citing *St. Cyr*, 533 U.S. at 308–09). Defendants have not shown evidence of such intent and the Court is unable to find any. Thus, mandatory detention statutes do not bar this Court's power to issue relief through a writ of habeas corpus.

### b. Merits of Fifth Amendment Claim

Having determined that the Court has the authority to grant habeas relief in the present case, the Court turns to the merits of Plaintiffs' claim. Plaintiffs allege that Defendants are violating their right under the Fifth Amendment to substantive due process by continuing to detain them during the ongoing pandemic. (Doc. No. 1 ¶¶ 114–17). Immigration detainees are civil detainees, and thus, entitled to the same constitutional due process protections as pretrial detainees. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000) ("We consider a person detained for deportation to be the equivalent of a pretrial detainee; a pretrial detainee's constitutional claims are considered under the due process clause instead of the Eighth Amendment."). Detention for noncriminal purposes is only allowed in narrow circumstances, "where a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint'" under the Fifth Amendment. *Zadvydas*, 533 U.S. at 690 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)). Detention as punishment for noncriminal purposes is not allowed. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Where the government is holding the detainee in conditions that amount to punishment, and those conditions

do not reasonably relate to a "legitimate, non-punitive governmental objective," such conditions violate the detainee's due process rights. *Cadena v. El Paso Cty.*, 946 F.3d 717, 727 (5th Cir. 2020).

Here, the Court finds that detention of Plaintiffs, who are at high risk of serious illness or death if they contract COVID-19, in MPC, where social distancing and proper hygiene are impossible, does not reasonably relate to a legitimate governmental purpose. Amici curiae, who are public health and human rights experts, have asserted that social distancing and proper hygiene, the only methods available to prevent transmission of the novel coronavirus, are not possible in detention facilities. (Doc. No. 27-1, at 14–15). Interim guidelines in effect at MPC fail to implement even simple hygiene measures, such as providing broad access to hand sanitizer and face masks. *Id.* at 17. Because there is no known vaccine or cure for COVID-19, prevention of transmission through proper social distancing and personal hygiene is the only option for medically vulnerable individuals, like Plaintiffs.. However, detention necessarily prevents Plaintiffs from protecting themselves in this way. Preventing Plaintiffs from protecting their own health from a high risk of serious illness or death does not reasonably relate to a legitimate governmental purpose and thus, violates the Fifth Amendment. *See Sheperd v. Dallas Cty.*, 591 F.3d 445, 453–54 (5th Cir. 2009) ("When the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . . it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." (quoting *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996))).

The Court understands that the government's purpose in detaining noncitizens is to ensure that detainees appear for removal hearings and deportation. However, under present conditions, that purpose is not served through detention. Requiring medically vulnerable individuals to remain

11

in a detention facility where they cannot properly protect themselves from transmission of a highly contagious virus with no known cure is not rationally related to a legitimate government objective. This is particularly true given that ICE has many other means besides physical detention to monitor noncitizens and ensure that they are present at removal proceedings and at time of removal, such as GPS monitoring and routine check-ins. Additionally, lowering the risk of broad and severe outbreak within MPC also furthers a governmental interest in keeping the community outside of MPC safe. As Amici noted, because staff come in frequent and close contact with detainees, and staff live within the community, an outbreak within MPC will inevitably spread to the surrounding community. Additionally, lowering the risk of transmission among a high-risk population in particular, by releasing Plaintiffs, will relieve the potential burden on regional hospitals and health care providers who are already stretched thin treating the general population. (Doc. No. 27-1, at 17). Thus, lowering the population, and especially the high-risk population, in immigration detention is in the government's interest as well. Where detention is unnecessary to effectuate the government's goals, keeping Plaintiffs detained and at high risk of serious illness or death violates their due process rights.

Defendant notes that the mere existence of illness or even death in detention does not constitute a violation of due process rights. The Court acknowledges that "isolated examples of illness, injury, or even death, standing alone, cannot prove" constitutionally inadequate confinement, nor can "incidence of disease or infection, standing alone, imply unconstitutional confinement conditions." *Sheperd*, 591 F.3d at 454. However, the current pandemic is not mere "incidence of disease or infection, standing alone." Our currently exigent circumstances, in which our communities are engulfed by a novel and highly contagious disease, are unlike any "incidence of disease" that our society has faced in generations. The potential for a mass outbreak of COVID-

12

19 within MPC is more than "isolated examples of illness . . . standing alone." Rather, for Plaintiffs, the threat of a mass outbreak is one that portends a high likelihood of serious illness or death, and is one that MPC cannot take sufficient steps to prevent.

Because detention of Plaintiffs in current conditions is unconstitutional, and because there is no way for Plaintiffs to be detained in conditions that are constitutional, the Court finds that Plaintiffs are likely to prevail on the merits of their habeas petition.

### 2. Irreparable Harm

Plaintiffs allege that they face irreparable harm because there is a strong likelihood that they will be infected with COVID-19 and, because of their medical vulnerabilities, they face a heightened risk of dying or suffering from serious illness and long-term health consequences. Plaintiffs must show that "irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A harm need not be inevitable or have already happened in order for it to be irreparable; rather, imminent harm is also cognizable harm to merit an injunction. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. . . . [A] remedy for unsafe conditions need not await a tragic event.").

Plaintiffs' alleged harm is both imminent and irreparable. The COVID-19 pandemic has reached every state in our nation, and the numbers of infected and dead increase daily. According to the CDC, those with particular medical vulnerabilities, including Plaintiffs, are particularly susceptible to serious illness and death. There is currently no vaccine or cure for COVID-19. Medical experts have also concluded that continued detention in ICE facilities during the current pandemic presents an "imminent risk to the health and safety of immigrant detainees." Letter from

13

Scott A. Allen, MD, FACP & Josiah Rich, MD, MPH to Committee Chairpersons and Ranking Members of House and Senate Committee on Homeland Security and Committee on Oversight and Reform 3 (Mar. 19, 2020), https://whistleblower.org/wp-content/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-to-Congress.pdf. The question of COVID-19 spreading in MPC, specifically, is not one of if, but when. One staff member at MPC has already tested positive for COVID-19. Given how highly contagious the virus is, and how it can remain asymptomatic after transmission, it is very likely that COVID-19 is already present within the MPC population. Indeed, Plaintiffs have presented affidavits from multiple sources who have witnessed detainees exhibiting COVID-like symptoms. (Doc. No. 1 ¶ 52). Although Defendants repeatedly assert that there are no confirmed cases of COVID-19 among the detained population, according to their own records, only three detained individuals have been tested as of April 13, 2020. Without more widespread testing, there is no way to know that COVID-19 has not already spread to MPC. Given Plaintiffs' vulnerabilities to serious illness if infected with the coronavirus and the serious and imminent risk of infection if they remain in immigration detention, Plaintiffs have shown irreparable harm.

### 3. Balancing of Equities and Public Interest

The equities at issue weigh in Plaintiffs' favor. Plaintiffs face serious irreparable harm if they are infected, in the form of severe illness, long-term health effects, and possibly death. Defendants have a countervailing interest in detaining Plaintiffs in order to ensure that they appear for future removal hearings and at time of removal. However, detention is not necessary to further Defendants' interest in preventing Plaintiffs from absconding. Rather, ICE has a number of alternative tools available to it to ensure enforcement, which it is free to use with Plaintiffs if they are released from detention. For example, ICE's conditional supervision program uses a combination of electronic ankle monitors, biometric voice recognition software, unannounced

home visits, employer verification, and in-person reporting requirements to supervise individuals released from detention. (Doc. No. 12-1, at 27). An initial study of ICE's alternatives to detention reported a 99% attendance rate at all immigration court hearings and a 95% attendance rate at final hearings among supervised individuals. U.S. Gov't Accountability Office, GAO-15-26, *Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness* 30 (2014). Thus, because Defendants' interests can be served through means other than detention, and Plaintiffs' interests are irreparably harmed by staying in detention, the balance of the equities favor Plaintiff.

The public interest also generally weighs in Plaintiffs' favor. As discussed *supra*, the public has an interest in preventing an outbreak in MPC. An outbreak among the MPC detainee population will inevitably spread through the surrounding community, as MPC staff members, who live outside the detention facility, will be exposed to sick detainees. Additionally, an outbreak in MPC will put additional strain on hospitals and health care resources in the community, which are already straining to care for the community at large during the pandemic. An outbreak that affects particularly vulnerable detainees, like Plaintiffs, would be especially draining on those limited medical resources, as MPC is not equipped to care for many seriously ill patients and will have to transport those patients to outside hospitals. Thus, the public has an interest in decreasing the likelihood of infection in MPC and, specifically, of Plaintiffs, in order to prevent a community-wide outbreak and to conserve health care resources during a pandemic.

However, the public also has an interest in maintaining public safety. It is undisputed that Plaintiff Rojas does not have a history of violence, and thus, poses no danger to the public. (Doc. No. 22, at 22; Doc. No. 24, at 8). Defendants merely cite a public interest in the enforcement of

immigration laws, which, although a public interest, is outweighed by the health interests at stake. Thus, the Court finds that Plaintiff Rojas does not pose a danger to the public.

Plaintiff Jebril, however, has a criminal history that is both recent and involved violence. Mr. Jebril pled guilty to two misdemeanors in late 2018, for assault of a family member and for violation of a protective order. (Doc. No. 22, at 9; Doc. No. 24, at 6). In October 2018, Mr. Jebril was ordered to have no contact with his wife after he was charged with assaulting her. (Doc. No. 22, at 9). However, he violated that protective order the next day to slash his wife's tires. *Id.* It is true that Mr. Jebril has served his sentence in criminal detention and is now detained only for civil immigration purposes. Mr. Jebril may not continue to be punished for his criminal history through prolonged civil detention. However, the Court is concerned that Mr. Jebril so brazenly violated a previous judicial order. Release from detention would necessarily come with conditions that Plaintiffs must follow, and Mr. Jebril has shown one recent instance of being unable to comply with court-ordered conditions. Moreover, Mr. Jebril's previous violent act was also targeted at his wife and occurred in the last year and a half. The Court is unaware of new developments that show Mr. Jebril's wife will not be a continued target for Mr. Jebril, and is concerned that Mr. Jebril will be able to contact her if released from detention. Finally, Mr. Jebril has been indicted for aggravated sexual assault; the charge remains pending pre-trial. (Doc. No. 22, at 9). Mr. Jebril is presumed innocent pending trial, so the Court refuses to consider this charge as evidence that Mr. Jebril is a danger to public safety. However, the Court does acknowledge that a pending criminal charge may increase risk of flight. Mr. Jebril's previous protective order violation, in conjunction with how recent his violent act was, weighs against his release, because he poses a danger to his wife. When considered in conjunction with his current risk of flight, the Court cannot find that it is in the public interest to release Mr. Jebril from detention.

## IV. CONCLUSION

The Court therefore **GRANTS** in part Plaintiffs' Motion for Temporary Restraining Order as a preliminary injunction and **ORDERS** the Government to release Plaintiff Georgina Rojas from detention immediately, under appropriate conditions of supervised release. The Court **DENIES** in part Plaintiffs' Motion as to Plaintiff Bassam Jabril.

The Defendants have not sought a bond and the Court finds and holds that no security need be posted. *See* Fed. R. Civ. P. 65(c); *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("In holding that the amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court, we have ruled that the court may elect to require no security at all." (internal quotation marks omitted)); *see also A.T.N. Indus., Inc. v. Gross*, 632 F. App'x 185, 192 (5th Cir. 2015) (holding that, under Rule 65(c), a court may elect to require no security at all as the amount it considers to be proper).

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 17th day of April, 2020.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE