United States District Court
Southern District of Texas
**ENTERED**
September 21, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROMAN VAZQUEZ BARRERA, *et al*, | § | |
| | § | |
| Petitioners, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-1241 |
| | § | |
| CHAD WOLF, *et al*, | § | |
| | § | |
| Respondents. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiff-Intervenors' ("Plaintiffs") Motion for Expedited Relief. (Doc. 57). Plaintiffs, on behalf of themselves and the putative class, seek expedited relief in the form of individualized bail hearings. Plaintiffs are individuals detained at Montgomery Processing Center who are particularly vulnerable to serious illness and death from COVID-19 due to their age and/or underlying medical conditions. They allege that their continued detention in the wake of the novel coronavirus pandemic violates their Fifth Amendment right to due process. Plaintiffs urge the Court to remedy the ongoing constitutional violations—and risk to their lives— through a process of bail hearings pending determination on the merits of their habeas petition. After considering the Motion, the parties' briefs and supplemental briefs, Amici Curiae's brief, parties' oral arguments, and all applicable law, the Court determines that Plaintiffs' Motion for Expedited Relief should be **GRANTED** in part, as to the Plaintiffs, and **DENIED** in part, as to provisional class certification.

1

## I.   FACTUAL BACKGROUND

Plaintiffs are eight[1] individuals detained by Immigration and Customs Enforcement ("ICE") at the Montgomery Processing Center ("MPC") in Conroe, Texas. (Doc. 1 at ¶ 1). All Plaintiffs suffer from underlying medical conditions that place them at increased risk of severe illness or death from COVID-19.

The relevant timeline is as follows. On April 29, Plaintiffs reported knowledge of three detainees and three staff who were confirmed to have COVID-19. (Doc. 44 at ¶ 3). On May 4, 2020, when Plaintiffs filed this Motion, that number had increased to seven. (Doc. 57 at 3). On July 24, 2020, Defendants reported that there were 100 detainees and thirty-two staff members who had tested positive for a COVID-19 infection. (Doc. 119-2 at ¶ 2.b; Doc. 119-1 at ¶ 2-3). There was reportedly only one active case among detainees. (Doc. 119-2 at ¶ 2.b). On July 29, the number of confirmed cases was reported to be 206 detainees. (Doc. 135-11 at ¶ 4). And yet by August 11, Defendants reported zero active cases and deaths among detainees. (Doc. 123-2 at ¶ 1.b). For various reasons, however, the Court lacks confidence in these numbers.

In their September 4, 2020 update, Defendants did not provide a total number of detainees who have tested positive at MPC since late-July. (Doc. 134). They did not report whether and how many more cases were confirmed throughout August. The reality is we cannot know the number of deaths or the severity of the illness among the over 200 detainees who were infected because Defendants released, transferred, or removed hundreds of them—including those with current

---

[1] The Court concludes there are currently eight Plaintiffs because Plaintiff Juana Hidrogo de Collins was reported by Defendants to have been removed to Mexico on August 7, 2020. (Doc. 123 at 1 n.1). Plaintiffs do not address Plaintiff Hidrogo de Collins' current detention status in their recent Motion for a Temporary Restraining Order on September 4, 2020. (Doc. 137). This Court will assume Defendants are correct, due to their asymmetric access to information, unless Plaintiffs provide otherwise.

infection and symptoms—amidst the outbreak. For example, former Plaintiff Bakasa had a confirmed COVID-19 infection with various symptoms when he was removed from the United States. (Doc. 95 at 1; Doc. 110 at 7).

Beginning in May 2020, Defendants reported various measures "striving to protect detainees from COVID-19." (Doc. 64 at 39). Detainees are evaluated for symptoms and isolated if symptoms are present. (Doc. 66-13 at ¶ 8). Staff with symptoms are told to stay home and seek medical attention. (Doc. 66-13 at ¶ 14.B.ii). Staff temperatures are taken before entry. (*Id.*) Staff movement is also mitigated "when possible." (*Id.*) However, staff are not tested with any regularity.

In addition, empty bunks are placed between detainees "[w]here possible." (*Id.* at ¶ 15.) Detainees are issued masks weekly, along with a training document. (*Id.* at ¶ 17). There are also gloves available for detainees to use while cleaning various areas in the facility. (*Id.* at ¶ 18).

Defendants reported having adequate medical isolation and quarantine locations for those who test positive. (*Id.* at ¶ 11). If a detainee is symptomatic or tests positive, the remaining housing unit is then cohorted until test results are received. (*Id.* at ¶ 11.B). Any new detainees are assigned to an intake housing unit for 14 days. (*Id.* at ¶ 11.C).

Plaintiffs also described their experiences at MPC—which differ from Defendants' account. Plaintiffs allege that, at least as of late July 2020, social distancing is not possible, and practices at MPC are insufficient to prevent the spread of COVID-19. (Doc. 135 at ¶ 187). Plaintiffs are not given hand sanitizer, or facial tissue, and there are often soap shortages. (*Id.* at ¶ 193, 201, 209, 220, 247). Plaintiffs, including those who are ill with COVID-19, clean the dormitories and bathrooms and are often not given gloves to do so. (*Id.* at ¶ 193, 202). Plaintiffs

are given masks, but are only required to wear them outside their dormitory and many detainees do not wear masks while in their dormitory. (*Id.* at ¶ 194, 203, 215, 225, 241).

Plaintiffs report that many MPC staff fail to wear masks, and that staff are still assigned to various units throughout the facility. (*See, e.g.*, Doc. 135-2 at ¶ 32-34; 135-4 at ¶ 15; 135-7 at ¶ 16). Notably, the staff member that Defendants depicted receiving a temperature check was not wearing a mask despite being in the building and within six feet of another staff member. (Doc. 64 at 41). Plaintiffs further allege they are not given any oral instructions on how to protect themselves—there are only written posters with limited guidance that do not include social distancing. (Doc. 135-3 at ¶ 21; Doc. 135-5 at ¶ 10). Plaintiff Rodriguez, as an example, cannot read the posters due to his vision issues. (Doc. 135-3 at ¶ 20).

Detainees who have tested positive are also transferred across various housing units during their COVID-19 recovery. (*See, e.g.*, Doc. 135-2 at ¶ 12-20; Doc. 135-4 at ¶ 10-12). At least some Plaintiffs who have tested positive for COVID-19 do not appear to have been re-tested.

The Court appreciates the actions that Defendants have taken since the initiation of this suit and the outbreak that began in late April. The Court is encouraged by the considerable decrease in  population at MPC. As of September 9, 2020, there were reportedly 161 detainees. (Doc. 143 at 5). The density within the housing units has also decreased. (Doc. 134-1 at ¶ 7). New detainees are tested and housed individually for fourteen days, then housed as a group another fourteen days, and enter general population after those twenty-eight days. (Doc. 143 at 38).

Defendants assert there has been a "near-total pause" of new detainees since June 11, 2020. (Doc. 134-1 at ¶ 5). Yet on August 11, 2020, Defendants also reported intaking thirty new detainees in the span of four days. (Doc. 123-2 at ¶ 1.b). Defendants have not provided a specific figure as to new intakes or the turnover at MPC, but stated to the court on September 10, 2020, that there

4

could be new detainees entering in a few weeks. (Doc. 143 at 25). In addition, it is still the practice to cohort detainees who are suspected but unconfirmed to have COVID-19. (*Id.*) This practice continues despite Center for Disease Control and Prevention ("CDC") guidance against cohorting unconfirmed cases.[2] Staff are also not tested unless they report symptoms and are told to stay home. Because asymptomatic transmission of the disease is very common, many of these practices fall short and continue to threaten detainees at MPC.

The timeline of events at MPC demonstrates that, despite the measures Defendants allegedly implemented, the detention facility nonetheless experienced a significant outbreak of COVID-19 while those measures were already in place.

## II.   PROCEDURAL HISTORY

Plaintiffs filed their Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief on April 8, 2020 (Doc. 1). On April 10, 2020, Plaintiffs filed a Motion for Temporary Restraining Order. (Doc. 12). The Court granted a preliminary injunction in part on April 17, 2020, and ordered the release of one Plaintiff. (Doc. 41). On April 29, 2020, Plaintiffs filed an Amended Complaint and added multiple new Plaintiffs to the suit (all of whom are no longer in MPC custody). Plaintiffs also filed a Motion to Certify Class. (Doc. 45).

On May 1, 2020, Defendants filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, along with a Motion to Strike the Amended Complaint. (Doc. 51; 52). Plaintiffs simultaneously filed a Motion to Expedite Discovery, requesting that Defendants identify the

---

[2] Center for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated July 22, 2020).

detainees in the proposed class. (Doc. 54; 55). On May 4, Plaintiffs also filed a Motion to Expedite Relief, seeking the immediate release of Plaintiffs and the putative class. (Doc. 57).

The Court held a Motions Hearing on May 21, 2020 to address the (1) Motion for Class Certification, (2) Motion to Dismiss, (3) Motion to Strike, (4) Motion for Expedited Discovery, and (5) Motion for Expedited Relief. On May 25, 2020, the Court denied Defendants' Motion to Dismiss and Motion to Strike Amended Complaint. The Court also deferred ruling on Plaintiffs' Motions until Defendants provided more information about the proposed class. Defendants filed responses to the Court's questions on May 28, (Doc. 82), and May 29, (Doc. 86).

On June 1, Defendants filed an ex parte spreadsheet identifying the medical conditions, criminal history, and immigration status of putative class members. (Doc. 87). Plaintiffs then filed a Motion to Compel Production of the Ex Parte Filing. (Doc. 88). Defendants shortly after filed a second Motion to Dismiss. (Doc. 92).

On June 8, 2020, the Court held a hearing and granted Plaintiffs' Motion to Compel Production of the Ex Parte Filing and Motion for Expedited Discovery. (Doc. 94). Defendants filed a Motion for Reconsideration of the Court's discovery order (Doc. 109), which the Court denied after a hearing on June 29, 2020.

On July 30, 2020, nine Applicants filed an Emergency Motion to Intervene. (Doc. 120). The Court held a hearing on August 31, 2020, and granted the permissive intervention of the current Plaintiffs. On September 4, 2020, Plaintiffs filed an Intervenor Complaint, adopting the prior allegations and making additional allegations. (Doc. 135).

On September 10, 2020, the Court heard arguments on the second Motion to Dismiss, Motion for Expedited Relief, and Objections to the Motion for Expedited Relief. The Court denied the Motion to Dismiss, denied the Objections to the Motion for Expedited Relief, and granted

*Amici* Law Professors' Motion for Leave to File an Amicus Brief. (Doc. 139). The Court also took the current Motion under advisement. The Court now turns to Plaintiffs' Motion for Expedited Relief.

## III.   LEGAL STANDARD

District courts have the inherent authority to grant bail pending the merits of a habeas petition under limited circumstances. *See Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974) (citing *Aronson v. May*, 85 S. Ct. 3 (1964)); *Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001); *Sacal-Micha v. Longoria*, 449 F. Supp. 3d 656, 662 (S.D. Tex. 2020) (recognizing the inherent authority to grant bail in district courts but denying the grant of such relief); *cf. Ex parte McCardle*, 74 U.S. 506, 508 (1868) (petitioner admitted to bail pending final judgment on a habeas petition).

The Fifth Circuit has stated that, "[i]n spite of the lack of specific statutory authorization, it is within the inherent power of a District Court of the United States to enlarge a state prisoner on bond pending hearing and decision on his application for a writ of habeas corpus." *In re Wainwright*, 518 F.2d 173, 174 (5th Cir. 1975) (per curiam); *see also Boyer v. City of Orlando*, 402 F.2d 966, 968 (5th Cir. 1968) (citing *Dawkins v. Crevasse*, 391 F.2d 921, 921–22 (5th Cir. 1968)) (granting immediate release on bail of state prisoner pending exhaustion for federal habeas review "in order to render [petitioner's] remedies truly effective").

In *Aronson v. May*, Justice Douglas recognized that this authority to grant bail pending a habeas petition extended beyond post-conviction habeas petitioners. 85 S. Ct. 3, 5 (1964). Indeed, Justice Douglas suggested habeas petitioners without a conviction could not only could seek this remedy, but may be subject to a lower standard than post-conviction prisoners. The Justice remarked, "[i]t is obvious that a greater showing of special reasons for admission to bail pending review should be required in this kind of case than would be required in a case where applicant

7

had sought to attack by writ of habeas corpus an incarceration not resulting from a judicial determination of guilt." *Id.*

The Fifth Circuit has also approved of applying authority for bail beyond post-conviction prisoners, including to immigrant habeas petitioners. *See Pierre v. United States*, 525 F.2d 933, 936 (5th Cir. 1976). In *Pierre*, the petitioners were Haitian citizens and refugees. *Id.* at 934. There, the court recognized the authority in habeas jurisdiction as including the "inherent power to grant bail pendente lite pending determination of the merits." *Id.* at 936.

However, this remedy is available only if a petitioner can show (1) substantial constitutional claims upon which the petitioner has a high probability of success and (2) exceptional circumstances that make bail necessary in order to make the habeas remedy effective. *See Calley*, 496 F.2d at 702.

## IV.   ANALYSIS

### A.   Whether the Court Holds Inherent Authority to Grant Bail Pending Plaintiffs' Habeas Petition

Defendants posit that Congress has silently curtailed this authority for bail pending a habeas petition. The Court notes at the outset that Defendants must overcome two "clear-statement rules" to warrant such a conclusion. First, there is a "longstanding rule requiring a clear and unambiguous statement of congressional intent to repeal habeas jurisdiction." *INS v. St. Cyr*, 533 U.S. 289, 298 (2001). This is especially true here because, "[a]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *Rasul v. Bush*, 542 U.S. 466, 474 (2004) (quoting *St. Cyr*, 533 U.S. at 300-301). Second, "where Congress intends to preclude judicial

review of constitutional claims its intent to do so must be clear." *Demore v. Kim*, 538 U.S. 510, 517 (2003).

This framework for habeas jurisdiction in immigration detention applies with equal force to a district court's authority to grant bail because that authority lies within habeas corpus jurisdiction. If Congress must speak clearly and explicitly to foreclose habeas jurisdiction—which grants the power for ultimate release—it cannot silently curtail the bail authority rooted in that jurisdiction.

Defendants argue that this inherent bail authority has been curtailed by Congress's mandatory detention for certain immigrants under 8 U.S.C. § 1226(c). The Supreme Court has squarely held that "federal courts have jurisdiction to review a constitutional challenge to § 1226(c)." *Demore*, 538 U.S. at 517. By its plain terms, Section 1226(c) strips the executive branch's statutory discretion over specific immigrants' detention, but it does not restrict judicial review over the *constitutionality* of detention.[3]

Defendants' reliance on Section 1226(e) is also misplaced.[4] In *Demore*, the Supreme Court explicitly stated that Section 1226(e) does not bar habeas review for a constitutional challenge to detention, 538 U.S. at 517, and their reasoning applies here as well. Plaintiffs do "not challenge a 'discretionary judgment' by the Attorney General or a 'decision' that the Attorney General has made regarding his detention or release." *Id.* at 516. They challenge the constitutionality of their confinement itself under the Fifth Amendment. Indeed, Section 1226(e) restricts judicial review

---

[3] Section 1226(c) states in relevant part, "[t]he Attorney General shall take into custody any alien who . . ." 8 U.S.C. § 1226(c).

[4] Section 1226(e) states, "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien." 8 U.S.C. § 1226(e).

of the Attorney General's discretionary decisions, while Section 1226(c), in turn, strips the Attorney General of precisely that discretion. Thus, the Attorney General's discretion is not implicated in Section 1226(c) at all.

Second, Defendants assert that the REAL ID Act of 2005 foreclosed habeas review of removal orders. While that may be true, this argument would apply to the petitioner in *Bolante*, who sought review of his removal order, but not to Plaintiffs. As already established, Plaintiffs have filed a habeas petition challenging their detention as unconstitutional under the Fifth Amendment—they do not seek review of a removal order.

For similar reasons, the Court declines to adopt the holding in *Bolante v. Keisler*, 506 F.3d 618 (7th Cir. 2007). As this Court already discussed (Doc. 41 at 9 n.2), the petitioner in *Bolante* sought bond while a challenge to his removal order was pending in the court of appeals—not a habeas petition. 506 F.3d at 619. The Seventh Circuit found no authority for bail under those circumstances, but did affirm that the "[i]nherent judicial authority to grant bail to persons who have asked for relief in an application for habeas corpus is a natural incident of habeas corpus, the vehicle by which a person questions the government's right to detain him." *Id.* at 620. Thus, *Bolante* is inapposite to the instant case. However, this Court need not rely on out-of-circuit precedent, either in *Bolante* or *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), because it can apply Fifth Circuit and Supreme Court precedent to grant bail pending this habeas petition.

Finally, Defendants argue that 8 U.S.C. § 1252(a)(2)(B)(ii) foreclosed the Court's authority to grant bail.[5] Again, the Supreme Court has already held that this provision does not bar habeas

---

[5] As relevant here, 8 U.S.C. § 1252(a)(2)(B)(ii) states, "no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security."

claims that challenge the constitutionality of detention—notwithstanding the executive authority under the statute. *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001). As discussed above, Plaintiffs do not seek review of DHS's discretionary decisions to detain them.[6] Rather, they challenge their detention on constitutional grounds, and the Supreme Court has made clear that habeas jurisdiction remains open for them to do so. *Id.*

Defendants also point to generalities about immigration being the prominent domain of the political branches. While the Supreme Court has recognized Congress's plenary power in immigration, it has also consistently allowed for habeas detention challenges—notwithstanding the provisions relied on by Defendants. *See, e.g.*, *Jennings*, 138 S. Ct. at 837–39 (deciding merits of habeas petition challenging indefinite mandatory detention under §§ 1225(b) and 1226(c)); *Demore*, 538 U.S. at 517 (finding jurisdiction to review habeas challenge to § 1226(c)); *Zadvydas*, 533 U.S. at 688 (holding that habeas remains available to review challenges to post-removal detention under § 1252).

Defendants' attempt to reshape jurisdiction-stripping provisions, that are inapposite to Plaintiffs' claims, are out of line with the robust framework requiring clear statements from Congress to bar constitutional challenges to detention under habeas. It does not follow that Congress silently foreclosed the authority—within habeas jurisdiction—to grant bail, while simultaneously allowing judicial courts to order the ultimate release of successful habeas

---

[6] In *Sacal-Micha*, the district court rejected a similar argument. In that case, the government contested the court's authority to grant bail by arguing that the petitioner could only be released through discretionary parole by DHS (pursuant to 8 U.S.C. § 1182(d)(5)(A)) because the petitioner was detained under 8 U.S.C. § 1225(b). *Sacal-Micha*, 449 F. Supp. 3d at 662-63. The court aptly noted that, "this Court would not order Sacal's release by finding that the Secretary of DHS should have done so under Section 1182, but only by finding that releasing Sacal is necessary to meaningfully consider Sacal's Petition for Writ of Habeas Corpus and to maintain the possibility of providing effective habeas remedy." *Id.*

petitioners. Therefore, the Court holds it has the proper authority to grant bail pending the final adjudication of Plaintiffs' habeas petition.

### B. High Probability of Success on Substantial Constitutional Claims

Plaintiffs must first show that they allege "substantial constitutional claims upon which [there is] a high probability of success." *Calley*, 496 F.2d at 702.[7] Here, the Plaintiffs allege that their continued detention violates their Fifth Amendment rights under the Due Process Clause. (Doc. 44 at ¶ 132-46).

Immigration detainees are entitled to constitutional protections under the Due Process Clause, like pretrial detainees, and not the Eighth Amendment. *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000). In *Zadvydas v. Davis*, the Supreme Court reiterated that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." 533 U.S. 678, 690 (2001). Detention outside of criminal punishment is only constitutional under certain "special and 'narrow' nonpunitive circumstances," where a "special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)). To be valid, detention must bear a "reasonable relation to the purpose for which the individual [was] committed." *Id.* (quoting *Jackson v. Indiana*, 406 U.S.

---

[7] Plaintiffs assert that some courts have not required immigration petitioners to prove a likelihood of success on the merits because, as civil detainees, they are subject to a lower standard than post-conviction prisoners. (Doc. 57 at 6 n.2). In *Aronson v. May*, Justice Douglas stated, "[i]t is obvious that a greater showing of special reasons for admission to bail pending review should be required in this kind of case than would be required in a case where applicant had sought to attack by writ of habeas corpus an incarceration not resulting from a judicial determination of guilt." 85 S. Ct. 3, 5 (1964). It is true that Plaintiffs are subject to civil detention and there has been no judicial determination of their guilt. However, Justice Douglas indicated civil detainees would be subject to a lower standard, but did not specifically note that this lower standard resulted in not having to show a likelihood of success. Therefore, the Court will apply the standard as set out in Supreme Court and Fifth Circuit precedent.

715, 738 (1972)). Where detention does not reasonably relate to a "legitimate, nonpunitive governmental objective," that detention falls outside the constitutional bounds of due process. *Cadena v. El Paso Cty.*, 946 F.3d 717, 727 (5th Cir. 2020).

This Court has already concluded there is a "substantial likelihood" that Plaintiffs will prevail on the merits of the aforementioned claims when it granted a preliminary injunction on April 17, 2020. (Doc. 41 at 13). Between the Court's preliminary injunction and the present, circumstances further deteriorated, and the Court's concerns were only confirmed. Plaintiffs and all detainees at MPC suffered a significant outbreak of COVID-19—amounting to 206 *confirmed* cases among detainees and at least thirty-two among staff.

As described in detail *supra*, Defendants had protective measures in place at MPC on May 18, 2020. At first blush, the measures seem extensive. However, they are severely undermined by the fact that such practices were implemented in May, and yet MPC suffered a massive outbreak in June and July under those practices. It appears that MPC, as the Court predicted, could not take sufficient steps to prevent an outbreak and harm to detainees.

Other district courts have similarly recognized that, despite the efforts by detention facilities, immigration habeas petitioners had met the standard to invoke bail while their petitions were pending. In *Yanes v. Martin*, for example, the relevant facility had "instituted a number of new procedures in response to the health risk." No. 120CV00216MSMPAS, 2020 WL 3047515, at *3 (D.R.I. June 2, 2020). Likewise, in *Savino*, the government described "strict protocols" instituted to prevent COVID-19 infection, yet the district court found that petitioners had shown a likelihood of success on the merits. *Savino v. Souza*, ––– F.Supp.3d ––––, 2020 WL 1703844, at *1, 8 (D. Mass. Apr. 8, 2020). The petitioners in both *Yanes* and *Savino* disputed many of the

measures the government alleged it had put in place. 2020 WL 3047515 at *3; 2020 WL 1703844 at *2.

In *Yanes*, the court found that, even assuming the factual assertions by the government were true, the substantial risk of harm to the petitioners remained. 2020 WL 3047515 at *3. In spite of the precautionary efforts made, the number of cases continued to increase. *Id.* There was continued congregation, including the cohorting of detainees while they awaited test results, staff mingling throughout the institution, and inconsistent information regarding new detainees. *Id.* As to the staff, the court observed that "staff clearly go in and out of the institution and mix to varying degrees with family and the public." *Id.* Additionally, the "high rate of false negative tests" undermined the process for new detainees. *Id.* at *4. Based on such circumstances, the court held "the burden [was] carried by the conditions that Respondents concede are present," and warranted relief in the form of bail hearings. *Id.* at *6.

In the instant case, there is also much dispute as to the actual implementation of some measures. But even if the Court were to assume the alleged measures are in place, the circumstances as conceded by Defendants, continue to present substantial risk of harm to detainees. Within the housing units, there is continued congregation where detainees are not required to wear masks, Defendants continue to cohort housing units with suspected COVID-19 cases, and there is no regular testing of staff despite the persistent threat of staff presenting the virus into the facility.

Similarly, the uncertainty of how many new detainees are being brought into MPC undermines the ability of Defendants to maintain their alleged decline in cases. While Defendants ambiguously allege a "near-total pause" (Doc. 134-1 at ¶ 5), they also reported processing as many as thirty new detainees in the span of only four days. (Doc. 123-2 at ¶ 1.a).  Defendants' uncertainty

14

about the influx of new detainees also does not offer much comfort. (Doc. 143 at 25). While new detainees are tested upon arrival, that process is likewise undermined by the high rate of false negatives, which will only be exacerbated if there is an increase in new detainees.

Unlike at MPC, however, in *Savino*, there had not been any detainees who had tested positive for COVID-19 and only one staff member. 2020 WL 1703844, at *2. In *Yanes*, there were forty-seven positive test results and no active cases among ICE detainees. 2020 WL 3047515 at *3 n.7. Here, the number of positive tests at MPC grew logarithmically—from three to seven to a hundred and then two hundred. The events between April and the present further confirm that MPC's measures are inadequate to stop the spread of an outbreak.

The Court is also left with doubts as to how MPC went from over 200 cases confirmed in late July, to reporting "zero active cases" in August. (Doc. 123-2 at ¶ 1.b). At least part of that decline was because Defendants released or transferred detainees with active COVID-19 infections and symptoms—thereby placing our broader community and health care systems at risk. The very limited testing also gives pause to the Court in accepting such a sharp decline.

Aside from the conditions within MPC, Defendants also make the argument that GPS monitoring is not an adequate alternative to detention because many detainees abscond, GPS does not monitor criminal activity, and ICE's resources are limited. (Doc. 64 at 47). If ICE continues to implement Alternatives to Detention, it is because it still considers such tools to be a reasonable alternative to detention. Unless ICE ends such alternatives, finding them ineffective or unreasonable, the Court will consider them as reasonable alternatives. As to the limited resources, the Court takes notice that, aside from GPS units, SmartLink and telephone reporting are two additional alternatives available to surveil immigrants upon release. (Doc. 75-6 at ¶ 17).

Given the timeline of events, the continued threat of another outbreak running its course through MPC, and the available alternatives to detention, the Court is unconvinced that Defendants' continued practices—which are similar to the practices in place before the last outbreak—should compel this Court to depart from its prior conclusion. Under present circumstances, the continued detention of medically vulnerable Plaintiffs does not reasonably relate to a legitimate government purpose. Plaintiffs have thus met the first prong in showing a high probability of success in what are decisively substantial constitutional claims.

### C. Exceptional Circumstances

Plaintiffs must also show "exceptional circumstances that make bail necessary to make the habeas remedy effective." *Calley*, 496 F.2d at 702. The Fifth Circuit has explicitly recognized one example of such circumstances as a "serious deterioration of petitioner's health while incarcerated." *Id.* at n.1; *see also Kennedy v. Adler*, 35 F. App'x. 386 (5th Cir. 2002) (per curiam); *United States v. Stafford*, 253 F.3d 701 (5th Cir. 2001) (per curiam).

The highly lethal and contagious nature of COVID-19, in the backdrop of our modern immigration detention system and Plaintiffs' medical vulnerabilities, fall nothing short of exceptional. The Court need not recount the death toll and devastation to make the point that the stakes are high, and Plaintiffs' position in a detention facility make their circumstances all the more precarious.

In May, Defendants insisted that any deterioration to detainees' health was speculative. (Doc. 62 at 48). Unfortunately, those statements have not aged well. Between approximately May and August 2020, over two hundred detainees, including four Plaintiffs, became infected with COVID-19. Because hundreds of detainees were released amidst the outbreak, we cannot know

for certain the extent of harm or death that resulted to detainees from that outbreak. The risk of serious health deterioration is either already present or persistently ominous for Plaintiffs.

The Court is unpersuaded by Defendants' position that serious illness or death from a virus with no cure, no vaccine, and sparse effective treatment is somehow unexceptional.[8] While it may be true that a district court's authority to grant bail pending a habeas petition seldom has been warranted, our society is seldom thrown into the throes of an incessant pandemic in which measures that may be unusual but are safely within legal authority must be invoked.

Plaintiffs continue to face grave risk of serious illness or death if they are infected with COVID-19 while in detention at MPC. Those who have already been infected remain at risk of further deterioration to their health because many patients report ongoing symptoms for weeks or months beyond the medical isolation period. (Doc. 135-11 at ¶ 8). In addition, the CDC reports that any protection from reinfection is uncertain.[9] Under these circumstances, it is "particularly

---

[8] Defendants also made specific arguments regarding Plaintiffs Bakasa and Diaz-Ramirez. Because both Plaintiffs are no longer in detention at MPC, those arguments are no longer relevant. And as to the question of hypertension, the CDC has since recognized hypertension as a risk factor that may increase the risk of severe illness from COVID-19, and ICE has also acknowledged as much. *See* Center for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions) (identifying hypertension as a condition that may cause an increased risk) (updated September 11, 2020); U.S. Immigration and Customs Enforcement, *Enforcement and Removal Operations, COVID-19 Pandemic Response Requirements*, https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (updated September 4, 2020). However, the CDC also currently states that "people whose only underlying medical condition is hypertension are not considered to be at higher risk." Center for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (updated September 10, 2020). The Court will take these current findings into consideration when making individual bail decisions.

[9] Center for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (updated September 10, 2020).

compelling to at least *consider* bail because the remedy that the petition ultimately seeks . . . would be illusory and, indeed, moot for any petitioner who became sick and suffered major adverse effects or even death as a consequence of confinement during the pendency of the action." *Yanes*, 2020 WL 3047515 at *2.

Thus, the Court finds that Plaintiffs have shown exceptional circumstances making bail necessary for a habeas remedy to be effective. In line with the nationwide trend, the Court joins other district courts who have invoked their authority to grant bail in immigrant detainee habeas petitions during the COVID-19 pandemic. *See, e.g.*, *Zepeda Rivas v. Jennings*, 445 F. Supp. 3d 36, 41 (N.D. Cal. 2020); *Yanes v. Martin*, No. 120CV00216MSMPAS, 2020 WL 3047515, at *6 (D.R.I. June 2, 2020); *Ferreyra v. Decker*, —— F. Supp. 3d ——, 2020 WL 1989417, at *12 (S.D.N.Y. Apr. 27, 2020); *Gomes v. DHS*, No. 20-cv-453-LM, Dkt. 34 at 2-4 (D.N.H. April 27, 2020); *Savino v. Souza*, —— F.Supp.3d ——, 2020 WL 1703844, at *8-9 (D. Mass. Apr. 8, 2020); *Avendaño Hernandez v. Decker*, No. 20-CV-1589 (JPO), 2020 WL 1547459, at *3 (S.D.N.Y. Mar. 31, 2020); *Coronel v. Decker,* 20-cv-2472 (AJN), 449 F. Supp. 3d 274, 288-89 (S.D.N.Y. 2020); c*f. Arana v. Barr*, No. 1:19-cv-07924-PGG-DCF, 2020 WL 1502039, at *9 (S.D.N.Y. Mar. 27, 2020), *report and recommendation adopted in part, rejected in part*, No. 19 CIV. 7924 (PGG), —— F. Supp. 3d ——, 2020 WL 1659713, at *8 (S.D.N.Y. Apr. 3, 2020) (ordering bond hearing before an immigration judge or release on his own recognizance).

### D.  Provisional Class Certification

Plaintiffs also ask the Court to grant provisional class certification for the putative class, defined as "[a]ll persons who are now, or will in the future be, detained in ICE custody at the Montgomery Processing Center, and who have been diagnosed with, or are receiving treatment for, an underlying medical condition and/or are over the age of 50." (Doc. 45-1 at 9).

At this time, the Court declines to grant provisional class certification. This does not constitute a ruling on the pending motion for class certification. (Doc. 45). The Court finds that it need not grant class certification to assuage the risks to those in detention at MPC who are most vulnerable to death or serious medical illness. As of September 9, 2020, there are reportedly 161 detainees at MPC. (Doc. 143 at 5). Plaintiffs account for eight of those detainees. The Court has already ordered discovery to assist Plaintiffs in identifying other putative class members. The Court believes Plaintiffs' counsel can identify additional detainees who may similarly be entitled to permissive intervention and expedited relief in the form of bail.

Defendants contend that individual bail determination necessarily defeats Rule 23 because the relief would no longer be indivisible. (Doc. 64 at 15) (citing *Wal-Mart v. Dukes*, 564 U.S. 338, 361 (2011)). The Court disagrees. First, Plaintiffs indeed seek an indivisible form of relief: each Plaintiff seeks a bail hearing. The ultimate outcome of that bail hearing may or may not be the same for each Plaintiff—but that does not defeat the identical relief sought and granted. Second, the bail hearings are, by definition, pending final relief on the merits. A final judgment may still result in indivisible relief. Thus, the Court's order for individual bail hearings does not defeat a future class certification or impact any final remedy on the merits.

For similar reasons, the Court rejects Defendants' position that granting bail pending a habeas petition equates to final relief and renders a claim moot. In denying Defendants' First Motion to Dismiss, the Court discussed at length why a preliminary injunction in the form of release does not moot a claim where final adjudication on the merits remains pending. (Doc. 79 at 2-8). This Court will not repeat itself here but will emphasize that any release pursuant to a bail determination would be pending the final adjudication of the habeas petition.

Because the Court declines to grant provisional class certification, it refrains from making any findings on the appropriateness of such measures or whether 8 U.S.C. § 1252(f)(1) prohibits classwide injunctive relief.

### E.  Individual Bail Proceedings

In accordance with other district courts, the Court grants an individual bail hearing for Plaintiffs who (1) have a medical condition recognized as a risk factor for COVID-19 and (2) do not have a violent and felonious criminal history. The Court is guided by other district courts in adopting the appropriate factors for individual bail determinations. In *Zepeda Rivas v. Jennings*, for example, the district court held that release was not warranted unless four factors were shown: "(i) the likelihood that the class will ultimately prevail on its habeas petition; (ii) the risk posed to the detainee by current conditions at the facilities; (iii) the likelihood that the detainee will not be a danger to the community if released with conditions; and (iv) the likelihood that the detainee will appear for subsequent immigration/removal proceedings as required."—— F. Supp. 3d ——, 2020 WL 3055449 at *1 (N.D. Cal. June 9, 2020). And in *Yanes v. Martin*, the district court ordered the parties to "address all relevant considerations, including any special characteristics of the detainee relative to medical risks, his criminal and immigration history, the danger if any to public safety presented by the release of that particular detainee, and the specific petitioner's plan for release." 2020 WL 3047515 at *3.

Like other courts, the Court will consider any relevant factors, including risks posed by their medical conditions and age, immigration history, criminal history, whether the Plaintiff poses a danger to the community, whether plaintiff poses a flight risk, and the Plaintiff's plan for housing and proper quarantine upon release.

At a hearing on September 10, 2020, Defendants raised the prospect of discovery on Plaintiffs' criminal histories. It is the Court's understanding that if Defendants oppose release on the basis of criminal convictions, it is because they have a factual or documented basis for such convictions. Defendants have broader access to such records as part of their routine investigation and proceedings—not Plaintiffs or their counsel. Defendants are free to provide exhibits from Plaintiffs' A-File or other necessary affidavits.

Therefore, as a logistical matter, the Court orders:

1. Plaintiffs will submit a brief in support of granting bail for each qualifying Plaintiff.

2. Defendants will then be given 48 hours to file a response.

3. The parties shall file any briefs and documentation under seal.

4. The Court will make a decision on the pleadings as soon as practicable.

5. Either party may move for reconsideration of a bail decision, and the Court will thereafter set a hearing.

## V.   CONCLUSION

The Court therefore **GRANTS** in part Plaintiffs' Motion for Expedited Relief and **ORDERS** individual bail proceedings as to the Plaintiffs who meet the requirements set out above. The Court **DENIES** in part Plaintiffs' Motion as to the provisional class certification.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 21st day of September, 2020.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE